UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,  :
                           :
                           :          Criminal Case No.: 1:07-cr-171
             v.            :
                           :          The Hon. Ellen Segal Huvelle
ROBERT JARED CARPENTER,    :
                           :          Sentencing:  November 1, 2007
      Defendant.           :
_____:

## DEFENDANT'S MOTION WITH REGARD TO
## 18 U.S.C. § 3553(a) SENTENCING FACTORS and
## <u>MEMORANDUM IN AID OF SENTENCING</u>


The defendant, Robert Jared Carpenter, through undersigned counsel, respectfully

submits to the Court his position regarding the sentencing factors espoused in 18 U.S.C. §

3553(a).  The Supreme Court's decision in *United States v. Booker,* 125 S. Ct. 738 (2005) and its

progeny require district courts to consider all the factors contained in § 3553(a) when calculating

a criminal defendant's ultimate sentence.  This motion presents Mr. Carpenter's position with

regard to those factors contained in § 3553(a).  In short, in light of Mr. Carpenter's lack of

criminal history, his long history of work, his community involvement, his early plea of guilty,

his remorse, his desire to continue to make restitution and the fact that he is now a convicted

felon, we respectfully request the Court to sentence him to the lowest sentence sufficient to meet

the goals of § 3553(a), a sentence we respectfully submit, does not require a sentence of

incarceration.  *See United States v. Ferguson,* 456 F.3rd 660, 665 (6th Cir. 2006).

## INTRODUCTION

Jared Carpenter stands before the Court for sentencing, having entered a plea of guilty to one count of tax evasion in violation of 26 U.S.C. §7201.  He brings with him an immeasurable amount of regret, remorse, sorrow, humiliation and despair for his conduct in this case.  To those who know Mr. Carpenter, it is inconceivable that he would stand accused of a crime of this nature.  Indeed, when the Court considers his upbringing, impressive background and actions in this case, it is quite clear that Mr. Carpenter is far from the typical criminal defendant.

We respectfully submit that Mr. Carpenter's conduct in this case is inconsistent and inapposite to the type of person that he truly is.  Nevertheless, Mr. Carpenter's actions in this case were wrong and unjustifiable.  In pleading guilty, Mr. Carpenter has taken full responsibility for his actions and offers his sincere apology to the Court, his family, friends, and the community.

## PERSONAL BACKGROUND OF MR. CARPENTER

**I.    MR. CARPENTER'S UPBRINGING**

Jared Carpenter was born in July, 1972, in Hanover, New Hampshire.  He was one of three children born to his parents who, shortly after his birth, moved to Connecticut, where his formulative years were spent in a suburban neighborhood.  Mr. Carpenter's parents, both now aged 60, provided a stable family environment akin to a Norman Rockwell painting where the family spent their dinners together discussing the events of the day, where the parents had teaching moments with their children, those seemingly unremarkable times when a parent imparts something to their children that they keep with them forever.

Mr. Carpenter's parents encouraged him to do well in school and be respectful of others.  His parents provided him with a stable home, proper guidance, direction and core values.

Mr. Carpenter's parents divorced during his senior year of college.  His father has remained in the Simsbury, Connecticut area where he is a practicing physician.  His mother entered a relationship with another individual some six years ago and now lives in an extremely rural area in central Vermont.

Mr. Carpenter's family, including his two siblings, was shocked to learn that he had been arrested in this case.  This matter has had a particularly devastating effect on those closest to him.

## II.    MR. CARPENTER'S EDUCATIONAL BACKGROUND AND WORK HISTORY

Mr. Carpenter graduated from the Loomis Chaffee School, in Windsor, Connecticut in June, 1991.  He was an extremely hard working student who was involved in numerous academic activities while in high school.  He matriculated the University of Colorado-Boulder in the Fall of 1991, where he earned a Bachelor of Arts degree in English, graduating in the Spring of 1996.

After graduating, Mr. Carpenter worked for the Connecticut State Senate Majority Leader as a Legislative Aide.  For the next two years he worked as a Clerk on a Subcommittee in the United States House of Representatives before spending one year with the Renew Our Urban Centers Fund.

Mr. Carpenter, from 2001 until October, 2006 worked for the Council of Republicans for Environmental Advocacy (CREA), where he held the position of Vice President.  This now defunct lobbying agency and Mr. Carpenter's work for them provides the backdrop for the criminal activity in this case.

After leaving CREA Mr. Carpenter returned to the rural Vermont area where his mother now resides and began working as a manual laborer for the Old City Tree Service in Stafford,

Connecticut, where he worked approximately 35 hours per week during the day and, contemporaneous with the tree service, worked at a grill in South Royalton in Vermont. He worked two jobs, albeit both low paying, in an effort to begin saving money to pay the back taxes which formed the basis of the charges in this case.

In April of 2007, Mr. Carpenter was admitted to the Master of Studies in Environmental Law Program at the Vermont Law School but continues to work part time.

## III.    THE OFFENSE CONDUCT

The offense conduct is presented in full in both the pre-sentence report and the statement offense provided by the Government to the Court at the time of the plea. We see no reason to restate these facts.

This case came before this particular court as a related case to a series of cases charged by the United States Attorney which in one way or connected to former lobbyist Jack Abramoff, who seemingly had an adverse effect upon the lives of almost everyone he touched. We believe it important to note that Mr. Carpenter was not involved in the shady dealings which brought down so many others associated with Mr. Abramoff, as they attempted in one way or another to exchange their official acts in return for money or other items of value.

We are aware that this court has presided over the other cases and would not attempt to substitute our view of Mr. Carpenter's culpability as compared to the others. We would suggest to the Court, however, that Mr. Carpenter would be at the very low end of the food chain. Clearly he would not rise to the level of Mr. Abramoff; nor would he rise to the level of ex-Interior official, J. Steven Griles, former Congressman Robert W. Ney, Ney's congressional aide, Neil G. Volz, or another Ney staffer, William Heaton, or former General Services Administration Chief of Staff David Safavian, simply to name a few.

Mr. Carpenter, unlike some others, did not lie to Congress, did not accept things of value in exchange for official acts, and did not violate congressional lobbying bans.  Mr. Carpenter simply failed to pay his personal taxes when due.

As the Court is aware, the consequences of this offense have had, and will continue to have, broad sweeping effects on his life, on his ability to earn a living and on many future activities which are hampered by a felony conviction.

## ARGUMENT

In determining Mr. Carpenter's sentence, this court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as the need for the sentence imposed to (1) "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (2) "afford adequate deterrence to criminal conduct" and (3) "to protect the public from further crimes of the defendant."  *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(a)(2)(C).  In support of his argument with regard to the relevant considerations, Mr. Carpenter offers the following:

**I        NATURE AND CIRCUMSTANCES OF THE OFFENSE**

The pre-sentence report prepared by Probation Officer Deborah Stevens-Panzer as well as the Information filed by the Government describes the criminal activity of Mr. Carpenter.  On its face, it would appear that Mr. Carpenter engaged in a much more elaborate scheme than was really present.  In reality, what Mr. Carpenter did was very simple.  CREA operated for most purposes on a cash basis.  His salary being paid in cash, payroll taxes were not withheld and at the end of the year, when Mr. Carpenter was required to file his 1040 tax form, he was always short of money.   Accordingly, when he would file his tax return, he did not attach with that return his tax payment.  This went on for three years.

The government, in their Memorandum in Aid of Sentencing, outlines how Mr. Carpenter was able to avoid paying taxes. Correctly, the government notes that CREA failed to maintain proper financial books and records and that Mr. Carpenter received his pay via cash transactions, that Forms 1099 were issued to him as opposed to Forms W-2, which would have required that taxes be withheld each pay period. (Government Memorandum at p. 2) However, the only illegality was Mr. Carpenter's failure to pay his personal taxes when they became due. (The government correctly notes (at p. 3) that "Carpenter did not include payment of taxes due and owing with the extension as required by law.") There is no allegation that Mr. Carpenter tried to hide what was due or misrepresent his salary.

Finally, the government goes to great lengths to accentuate the fact that our tax system relies upon the voluntary compliance of each taxpayer and that "[t]axpayers need to believe that there are substantial consequences for LYING (emphasis added) on their tax returns . . .(and) to ensure respect for this voluntary system of compliance, those who do not REPORT (emphasis added) and pay their fair share of taxes need to be prosecuted and punished." Id. At 5.  Further, the government notes that CREA, being a tax exempt organization, "owes the American public complete transparency in reporting . . . salaries . . . because tax fraud involving tax-exempt organizations undermines not only tax enforcement but also all legitimate tax-exempt organizations and their missions." Id. at 6. We agree wholeheartedly.

However, as wrong and as illegal as Mr. Carpenter's actions were in not paying his taxes when due, he did not attempt to defraud the Government by lying on his 1040 regarding the amount of money he received and he did not take deductions for items that should not have been deducted.  He simply failed to pay the tax that was due and for which he will now not only have to pay  as "restitution" the tax, but also pay penalties and interest. The American public will be

able to see what he was paid. CREA did not lie nor fail to report his salary and Mr. Carpenter did

not lie on his tax forms nor fail to report his taxes. He simply did not pay the taxes when due,

because he did not have the funds to make the payment. He acknowledges that it was wrong and

illegal and that it was his own fault that taxes were not withheld. He acknowledges that he has no

one to blame but himself, but as his advocate this counsel is compelled to point out the

limitations of his illegal actions.

In considering the "nature and circumstances of the offense" under § 3553 (a)(1), we urge

the Court to recognize the offense for what it truly was.  It was wrong.  It was illegal.  But it was

the result of a man who believed, erroneously as it turned out, that the day would come that he

would be able to pay his back taxes.

## II.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Mr. Carpenter is 35 years old.  As we have indicated earlier, he is a college graduate who

has worked long and hard almost every day of his life after graduating college.  When he had to

begin working manual labor, planting shrubs and raking yards during the day and attending bar

and busing tables at night, he did it without flinching.  Knowing that the only way to secure a job

with sufficient salary to pay his back taxes would require further education, without hesitation he

enrolled in courses at the Vermont School of Law.

Even given the nature and circumstances of this offense, viewed  in the extremely ugly

picture painted (mainly because of the involvement of Jack Abramoff), Mr. Carpenter's family

still stands beside him.  All those who know him regardless how upset they may be with him by

the actions which bring him before the Court, they will stand beside him.

There is no question that Mr. Carpenters' conduct in this case was wrong.  But it was not

the conduct of a man with an evil heart or a person who believed that he would be able to cheat

his government. Aside from the issue before the Court now, Mr. Carpenter has been a law

abiding citizen who has been devastated by these charges.

**III      THE NEED TO REFLECT THE SERIOUSNESS OF THE
         OFFENSE, PROMOTE RESPECT FOR THE LAW, AND
         TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE**

Again, we submit that Mr. Carpenter's long history of employment, devotion to family,

lack of criminal history, along with the fact that he admitted his guilt early on, working low

paying jobs, suffer the consequences of being a convicted felon, are all sufficient punishment to

reflect the seriousness of his involvement  in this offense and to promote respect for the law. We

respectfully submit that a period of incarceration is not necessary to satisfy any of the objectives

of § 3553.

**IV      THE NEED TOAFFORD ADEQUATE DETERRENCE
         TO CRIMINAL CONDUCT**

We submit the same factors listed above to promote respect for the law and to provide

just punishment also afford adequate deterrence to criminal conduct. Clearly Mr. Carpenter has

been deterred. The shame and humiliation he feels, even if there were no other consequences,

would serve to deter him. A felony conviction, the civil liberties one loses after a felony

conviction and overall public humiliation are enough, given the facts of this case, to deter

criminal conduct by others. Again, we are aware of the government's position, addressed *supra*

at pp. 6-7, that prosecution and punishment are necessary to deter tax cheats from lying on their

tax forms or failing to report taxes. We agree with that proposition but once again note that in the

case before the Court, this taxpayer did correctly complete his tax forms and did correctly report

his salary. Given the unique circumstances of this case, we respectfully submit that, while

prosecution and punishment are important, incarceration is not needed to ensure that other

taxpayers do not cheat on their taxes.

## V.    THE NEED TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY MR. CARPENTER

There can be no real dispute that there is no need for a period of incarceration in this case to protect the public from future crimes by Mr. Carpenter.  Mr. Carpenter's arrest and his involvement in the criminal justice system, along with the conviction and attendant consequences, is more than sufficient to ensure that Mr. Carpenter will never again make a bad decision with respect to any illegal conduct.  This has been a hard learned lesson for Mr. Carpenter.  The public needs no protection from him.  Since his arrest, he has cooperated with the government in every aspect and been truthful with government agents and the Probation Office.

## VI.    THE NEED TO PROVIDE RESTITUTION

Mr. Carpenter, as a part of his plea agreement, agreed to make full restitution, paying all back taxes by the time of his sentencing.  He believed then that he would be able to do so.  It was his desire to borrow money from either family or banking institutions and to repay his family or the banks from future earnings.  With the debts that he has and jobs he now holds, Mr. Carpenter has been unable to secure a loan.  His parents, while they love him, and while they are more than willing to assist him by paying his tuition to further his education, are unwilling to pay his tax burden for him.  In heart felt letters to Mr. Carpenter, both his mother and father have expressed that they do not believe it is their burden to pay his taxes for him, and indeed doing so would not be the proper example to set for a child.[1]

---

[1] Counsel for Mr. Carpenter has spoken with the government regarding this issue.  A hard copy of this motion will be provided to government counsel and attached to that hard copy will be the letters of rejection from the bank and the letters from Mr. Carpenters' parents.  The bank rejection letters  will not be attached to this motion because the motion is filed electronically and there are many matters within the letters which are not appropriate for public view. Should the Court desire to see any of the letters we will be more than happy to provide them to chambers and, in any event, will have copies at the time of sentencing.

Mr. Carpenter has, by a separate account, been setting aside money from his checks to have something to show at the time of sentencing.  He will be prepared to write a check for the entire amount he has saved over the past few months when he appears for sentencing.  Even though he is now be taking courses at the Vermont Law School, he continues to work and it will be his goal to continue to make payments to the government from his pay check until he graduates and secures a better paying job, at which time he plans to pay off the federal government at the earliest possible moment.

The government urges a period of one year of supervised release following, what would be by the guidelines, if they were mandatory, a short period of incarceration. We respectfully submit that the section 3553 dictate to consider restitution, weighs in favor of a lengthy period of probation, whereby Mr. Carpenter can continue to work, continue to further his education to allow for an even better paying job, and not have all he has worked for disrupted. Clearly this would offer a better chance of full restitution than incarceration and one year of supervised release. If this crime and the advisory guidelines called for a lengthy period of incarceration because the offender needed such for punishment or society needed such for protection, then restitution would not carry such weight. But this crime and the advisory guidelines do not call for such severe punishment.

## **CONCLUSION**

The advisory sentencing guideline range in this case, based on a criminal history I, with an offense level of 12, provides an advisory guideline range of from ten to sixteen months.  If the guidelines were mandatory the Court would be obliged to sentence Mr. Carpenter to at least five months of imprisonment and five months of home detention.

Obviously, the Court, by recent Supreme Court decisions, is required to consult the guidelines. But there should be no thumb on the scale in favor of a guideline sentence. Although the Court must consider the advisory guideline range, that range is not to be treated as a tether. As we indicated earlier, there is a statutory command to impose a sentence "sufficient but not greater than necessary" to achieve the specified purposes of punishment. This principle, which traces back to Charles de Secondat, Baron de Montesquieu, has been a central maxim in American criminology since the framing of the Constitution.

Mr. Carpenter, like so many young ideologues, came to Washington, D.C., eager to become involved in politics. Also, like so many others, he fell prey to the fast, hectic lifestyle of politics, was indeed easy prey to those who would work him around the clock, convince him their ideas were the only ideas that could save the country, and, in essence, use him for all he was worth. His experience in politics and then with the criminal charges in this case, have led to all manner of anxiety and even premature loss of his hair. Luckily, he was able to extricate himself from the jaws of Washington, D.C., and, as the Court can see from the attached letters and even the presentence report, his return to Vermont has been a positive possibly even life saving change for him. This slower lifestyle, surrounded by good, decent human beings, has brought about a world of change for Jared Carpenter.

Considering all the factors of 18 U.S.C. § 3553(a), as outlined herein, along with the regret, remorse, sorrow, humiliation and despair that Mr. Carpenter feels for his conduct in this case, we respectfully pray that the Court sentence Mr. Carpenter to a term of probation and order as conditions of probation  restitution, community service, and, if the court feels more punishment is necessary, a period of six months home detention, allowing Mr. Carpenter to

continue with his education during that six month period. We submit that such a sentence is, given this crime and this offender, not only fair and just but also reasonable.

Respectfully submitted,

_____/s/_____
G. ALLEN DALE - Bar No. 954537
601 Pennsylvania Avenue, N.W.
Suite 900 - North Building
Washington, D.C.  20004
(202) 638-2900
Facsimile:  (202) 783-1654
gallendale@aol.com

EXHIBIT 1

# Robert J. Carpenter, M.D. F.A.C.S. M.S. (Oto)
## Otolaryngology - Head and Neck Surgery
### 20 Highwood Road
### Simsbury, Connecticut 06070

Phone: 860.559.6510
doctorrjc@comcast.net

University of Connecticut
Health Center
Division of Otolaryngology

Adult and Pediatric

Nasal and Sinus

Head and Neck

Throat - Voice

Ear Disorders

Hearing

October 21, 2007

The Honorable Ellen Segal Huvelle
United States District Court
301 Constitution Ave. N.W.
Washington, D.C. 20001

Re: United States v. Robert Jared Carpenter
CR 07-171 (DDC)

Dear Judge Huvelle:

I am writing this letter as a character reference for Robert Jared Carpenter.

Robert Jared is, and has been through his school and working years, a serious and hard working individual dedicated to the task at hand and willing to put the organization for which he is working foremost in his efforts.

Prior to the present, Robert Jared has never been in any type of legal situation in his life and has been a law abiding and contributing member of his community. He was president of his fraternity in college and a leader and after college has held several positions of responsibility and done well.

Unfortunately, while in Washington, he became caught up in an environmental organization where he put the goals and viability of the organization ahead of his personal well being.

He is very regretful that this occurred.

In the past seven months since leaving Washington Robert Jared has done an excellent job of reorganizing his life.

Over the summer he worked two jobs, and applied and was accepted at Vermont Law School in the Masters of Environmental Law program,

At present he is enrolled in the first semester of the Environmental Law program, is working part time to pay his expenses and has been putting money aside from his jobs to pay off his tax debt.

I think his efforts in the past eight months are a more accurate reflection of his character, ability and dedication to task.

I have been proud of his dedication and hard work in the recent months and I hope you will take these efforts into consideration.

Robert J. Carpenter M.D.

Hon. Ellen Segal Huvelle                                        October 21,2007
United States District Court
301 Constitution Avenue, N.W.
Washington, DC 20001

              Re:  United States v. Robert Jared Carpenter
              CR 07-171 (DDC)

Dear Judge Huvelle:

Jared moved to Washington about ten years ago as an eager 'staffer' for his Connecticut
Congressman, Christopher Shays. In time, he was offered a position in the newly
established non-profit organization, CREA, an environmental advocacy group with the
Republican Party. He jumped at the opportunity, thrilled to be working on environmental
issues with Republican Members of Congress. Pretty heady stuff for a young man in his
twenties.

Jared has always had a passionate interest in the environment. He grew up in a country
setting; our property had a large pond and Jared was fascinated with the creatures living
there. He spent many summer months living in the Maine wilderness at an
environmental camp in Wiscasset, Maine.

He attended college in Boulder, CO, becoming familiar with a landscape that would serve
him well as he researched western land and water issues for Members of Congress.

I can remember conversations with Jared as he detailed his research on environmental
policy issues: land and water rights, sprawl, migratory birds and coastal waterways, and
whatever else was of current interest to Congressional constituencies.

Jared was consumed by his work and when things went sour, he threw the same energy
into trying to make it work.

As parents, we felt helpless and watched with horror as Jared's life deteriorated. At times
we couldn't communicate with him because his phone had been turned off; he lived in
constant fear of being evicted from his apartment. He had no money other than what we
sent him. And all the while, we begged him to leave DC, encouraging him to look into a
Masters Degree in Environmental Law – change his tact, and give credence to his
interests. We knew nothing of the black hole Jared had dug for himself, and his desperate
attempts to make the money to pay his debts.

In April, Jared moved to Vermont and has lived with me until he moved into his
apartment in South Royalton just before beginning graduate school in environmental law.

He worked two jobs all summer and has continued working while in school, putting money each month into an account to pay back taxes.

As a mother, I am thrilled with Jared's new sense of purpose and commitment. He now discusses his course work with the same passion that he had expressed in his early days with CREA. After feeling so remorseful for so long, he finally has a positive sense of his future. I cannot tell you how happy I am.

I truly hope that you will allow him to continue his studies and efforts to rehabilitate himself to become the honorable citizen I know he really is.

Very truly yours,

Margaret Carpenter

October 10, 2007

Hon. Ellen Segal Huvelle
United States District Court
301 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:  United States v. Robert Jared Carpenter
CR 01-171 (DDC)

Dear Judge Huvelle:

As fiance to Robert Jared Carpenter's youngest brother, Colin, I have gotten to
know Jared very well. I first met Jared in the summer of 2001 and have since spent most
holidays and summer vacations in his company. I have both intimate knowledge of his
family and an objective understanding of his character. Jared's close relationship with
his parents and brothers, and his investment in his graduate program speak to his strong
values and his desire to rebuild his life as a contributing member of society.

Since Jared has moved to Vermont, the time I have spent with him has been
during important family events. Jared took time from work in April to attend his
grandmother's funeral in Canada and then helped his father with the emotional task of
cleaning out her home. He joined us at the week-long family reunion only for the
evening of my engagement party. Most recently I spent an evening with him at his
mother's home when his third brother, John, was visiting from New York. Outside of
these very special events, Jared spends all of his time attending class, working, and
studying.

Having just completed a one-year masters in June, I know how intense a program
like Jared's can be. I am impressed by the academic focus and discipline he maintains
while also working twenty hours each week. He speaks passionately about his
coursework and is planning his future career in environmental management and
preservation. When he applies the same passion and commitment to his career, I know
Jared will contribute valuably to the field.

Though his brothers are seven and nine years younger and hold very different
interests (Colin is a PhD candidate in engineering and John is a musician and works in
documentary film), Jared is a caring and involved older brother. He has warmly received
me as a member of the family, and I am proud of what he has accomplished since moving
to Vermont. Although he has made mistakes, I know that he is truly sorry and only wants
to move toward the future.

Very truly yours,

Katie Percarpio
Katie Percarpio

5056 Macomb Street, N.W.
Washington, DC 20016
October 5, 2007

Hon. Ellen Segal Huvelle
United States District Court
301 Constitution Avenue, NW
Washington, DC  20001

Re: United States v. Robert Jared Carpenter
CR 07-171 (DDC)

Dear Judge Huvelle:

I am writing in connection with the forthcoming sentencing of Robert Jared Carpenter in the above matter.

Briefly, I have known Jared's mother Margaret Carpenter for several years and have seen her in my home in Washington, as well as in Vermont where she and Jared now live, and I have a second home.  The investigation that eventually led to Jared's guilty plea has shocked Margie and others around her, and she has taken important steps to help Jared get his life back on track.

Jared lived for some time with his mother and is now staying close to her and keeping in touch as he participates in a graduate school program and otherwise tries to live in a productive, properly functioning way.  On several occasions Margie expressed her deep concern for Jared and talked to me about his remorse at his past actions.  While I do not know Jared well, I have been impressed with the effort and emotional energy that has been spent by the family to ensure that Jared has strong social support and encouragement as he goes through his current travails and attempts to gain skills that will permit him to be independent and to change his life so that he can move in a new positive direction.

I hope his sentence is designed to facilitate his continued rehabilitation.

Very truly yours,

Maria K. Burka

Maria K. Burka



**FOLEY**

FOLEY & LARDNER LLP

FOLEY & LARDNER LLP
ATTORNEYS AT LAW

WASHINGTON HARBOUR
3000 K STREET, N.W., SUITE 500
WASHINGTON, D.C. 20007-5143
202.672.5300 TEL
202.672.5399 FAX
www.foley.com

WRITER'S DIRECT LINE
202.672.5345
rburka@foley.com EMAIL

CLIENT/MATTER NUMBER
999999-0099

October 9, 2007

Hon. Ellen Segal Huvelle
United States District Court
301 Constitution Avenue, N.W.
Washington, DC 20001

> Re:  United States v. Robert Jared Carpenter
>       CR 07-171 (DDC)

Dear Judge Huvelle:

I have read the October 5th letter from my wife Maria Burka about Robert Jared Carpenter and wish to join in it.

In doing so, I would like to provide some additional information, the result of my spending an evening with Jared early last summer when my wife was not with me. Briefly, at a time when Jared was still under investigation and very uncertain about his future, we discussed his plans for this fall, ones that focused on his obtaining training in environmental matters that will likely lead to employment in that field.

I was struck at that time by his desire to develop those skills and to be productively employed going forward. Moreover, I was impressed with his desire to further knowledge of environmental issues and to help achieve laudable goals in that area.

I, too, hope that his sentence be designed to facilitate his continued efforts toward rehabilitation.

Very truly yours,

Robert A. Burka

BOSTON          JACKSONVILLE    NEW YORK        SAN DIEGO/DEL MAR    TAMPA
BRUSSELS        LOS ANGELES     ORLANDO         SAN FRANCISCO        TOKYO
CHICAGO         MADISON         SACRAMENTO      SILICON VALLEY       WASHINGTON, D.C.
DETROIT         MILWAUKEE       SAN DIEGO       TALLAHASSEE          WEST PALM BEACH
WASH_2087033.1